**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1728
_____

K.A., a minor, by and through her next friend, Michael Ayers

v.

POCONO MOUNTAIN SCHOOL DISTRICT,
                                         Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 3:11-cv-00417)
District Judge: Honorable A. Richard Caputo
_____

Argued October 24, 2012

Before: HARDIMAN, GREENAWAY, JR., and
VANASKIE, *Circuit Judges*

(Filed: March 12, 2013)

Keely J. Espinar, Esq. [ARGUED]
John E. Freund, III, Esq.

King, Spry, Herman, Freund & Faul, LLC
One W. Broad Street, Suite 700
Bethlehem, PA 18018
  *Counsel for Appellants*

David A. Cortman, Esq. [ARGUED]
John M. Sharp, Esq.
Alliance Defense Fund
1000 Hurricane Shoals Road, N.E., Suite D-1100
Lawrenceville, Georgia 30043
  *Counsel for Appellees*

Jeremy D. Tedesco, Esq.
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
  *Counsel for Appellees*

Randall L. Wenger, Esq.
Independence Law Center
23 North Front Street
Harrisburg, PA 17101
  *Counsel for Appellees*

William T. McEnroe, Esq.
Will W. Sachse, Esq.
Dechert LLP
2929 Arch Street, 18th Floor, Circa Centre
Philadelphia, PA 19104
  *Counsel for Amicus Curiae, the American Civil*
*Liberties Union of Pennsylvania*

———————

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge.*

K.A. was a fifth-grade student at the Barrett Elementary Center of the Pocono Mountain School District (the "School District"), who was prohibited from distributing invitations to her classmates to a Christmas party at her church. Her father filed suit on K.A.'s behalf, alleging that the School District had violated her First and Fourteenth Amendment rights. The District Court, applying the test announced in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), and finding no evidence that distribution of the invitations would threaten a "substantial disruption" of the school environment or interfere with the rights of others, *id.* at 514, granted K.A.'s motion for preliminary injunctive relief. For the following reasons, we will affirm the District Court.

I.

In December 2010, K.A. attempted before the start of class to hand out invitations to her classmates to a Christmas party at her church. The invitation was a flyer prepared by the church and stated the following:

> iKidzROCK Night
> Christmas Party
>
> Just for KIDS!
> (Grades K-6)

3

Friday, December 10th
6:45-8:30pm

Face Painting, Ping Pong,
Foosball, Cup-Stacking,
Games, Prizes, Puppets, Music,
Snacks, and more!

Admission and all activities are
free!

BRING A FRIEND!

INNOVATION CHURCH
ROUTE 940, 3 MILES EAST OF
MT POCONO
592-2000, EXT. 102

(A. 100.)

K.A. maintains that she wanted to hand out the invitations to share her religious faith with her classmates. While students at the Barrett Elementary Center are normally allowed to pass out invitations to birthday parties, Halloween parties, Valentine's dances, and the like during non-instructional time, K.A.'s teacher, Christina Sopko, informed K.A. that the principal, Heidi Donohue, would have to approve the flyer before she could distribute it. After K.A. submitted the invitation for review, K.A.'s father e-mailed Donohue to see if the flyer had been approved. Donohue informed K.A.'s father that non-school related flyers had to be approved by the superintendent, and the superintendent

4

had not approved K.A.'s invitation. When the father asked for a written explanation for the denial, Donohue referred to District Policy 913. When he sought more clarification, the superintendent, Dr. Dwight Pfennig, informed him that Policy 913 provided Pfennig with the authority to prohibit the distribution of such a flyer.

At that time, Policy 913 stated, in pertinent part, that:

> Any requests from civic organizations or special interest groups which involve such activities as patriotic functions, contests, exhibits, sales of products to or by students, sending promotional materials home with students, graduation prizes
> or fund raising must be examined to insure that such activities promote student interests primarily, rather than the special interests of any particular group. . . .
>
> No individual, firm or corporation shall be permitted to engage in commercial advertising, promotion, solicitation or sales with regard to the student body, faculty, staff or the public on school district property or at any school sponsored activities unless

> the same shall have been previously approved in writing by the District.

(A. 116.)

K.A.'s father filed suit on her behalf in March 2011, alleging the School District had violated her First and Fourteenth Amendment rights when it denied her permission to distribute the flyer. K.A. filed a motion for a preliminary injunction in July 2011, requesting an order from the District Court barring the School District from prohibiting her distribution of religious flyers and materials.

The School District revised Policy 913 twice since the suit was filed. When the District Court first ruled on the motion for a preliminary injunction, the revised policy stated, in pertinent part, that:

> The Board prohibits the use of students and staff members for soliciting, advertising, or promoting nonschool events, organizations, groups, or individuals during the school day or at school-sponsored locations or events not otherwise open to nonschool organizations, groups, or individuals.
>
> During the school day, only literature and materials directly related to school district activities

6

or that contribute significantly to district instructional programs may be disseminated to or through students and staff members. Prohibited materials may never be distributed or used at any time.

A review of any nonschool written materials under [t]his policy will not discriminate on the basis of content or viewpoint, except that prohibited materials will be rejected, as will any materials that do not comply with Board policy, administrative procedures, or written announcements relating to the proposed nonschool[-]sponsored materials.

Appropriate literature and materials relevant to nonschool organizations, groups or individuals may be disseminated by school[-]sponsored organizations involved in such activities as fundraising and community service, contingent upon approval by the Superintendent and/or designee.

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, No. 3:11-CV-417, 2011 WL 5008358, at *2 (M.D. Pa. Oct. 20, 2011).

After the District Court granted K.A.'s motion for a preliminary injunction, the School District removed the word "Appropriate" from the final paragraph quoted above, and additionally added to the first paragraph the following language: "An authorized representative of the nonschool organization or group must issue any and all requests to distribute and/or post nonschool materials. The request must be made in writing to the building principal." (Appellee's Br. Addendum 4-5.)

Subsequent to the initiation of this lawsuit, the School District also revised Policy 220, which deals with "Student Expression."[1] (Appellee's Br. Addendum 1.) Policy 220 now states, in pertinent part, that:

> Only literature and materials directly related to school district activities or that contribute significantly to district instructional programs may be disseminated to or through students and staff members. However, invitations to individual

---

[1] The School District claims Policy 220 was not considered in the denial of K.A.'s flyer, because Pfennig and Donohue had considered the invitation "as the solicitation materials of a nonschool organization, not student speech." (Appellant's Br. 7.)

student hosted social events (i.e. birthday parties, holiday parties, etc.) and/or holiday recognition cards may be distributed during designated non-instructional times during the school day upon approval of the Superintendent or designee.

The Board shall require that students who wish to distribute such materials request administrative approval prior to distribution.

(Appellee's Br. Addendum 2.)[2]

The District Court analyzed the School District's refusal to allow K.A. to distribute the flyers under the test established by *Tinker*. Specifically, the District Court considered whether the School District's decision was justified by "'a specific and significant fear of disruption, not just some remote apprehension of disturbance.'" *K.A.*, 2011 WL 5008358, at *3 (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001)).

---

[2] At the time K.A. sought to hand out the flyers, Policy 220 stated that the School District could prohibit student expressions which "[s]eek to establish the supremacy of a particular religious denomination, sect or point of view." (A. 114.) This language has since been removed from Policy 220.

The School District contended that its refusal to allow distribution of the flyer was supported by safety concerns and the possibility that parents might believe the party was a school-sanctioned event if it was sent home with students. The District Court rejected these concerns, noting that "the Superintendent does not appear to have taken any steps to acquaint himself with the church or find out additional information" that would have led him to believe the Christmas party was unsafe in any way. *Id.* at *4. The District Court further observed that Pfennig testified that students at Barrett Elementary Center "frequently bring home invitations to student birthday parties, as well as solicitations and other material from outside organizations," putting parents "on notice that much of the material that came home was for non-school sponsored events." *Id.* As such, the District Court held that the School District could not "articulate a specific and significant fear of disruption if K.A. was allowed to pass out her flyers." *Id.*

Responding to the School District's contention that its restrictions on K.A.'s flyer distribution should be evaluated under forum analysis, rather than under *Tinker*, the District Court concluded that, "[e]ven assuming a nonpublic forum analysis was appropriate, the [S]chool [D]istrict's actions were likely too broad and arbitrary to stand up to constitutional challenge." *Id.* at *5. The District Court explained that it did not appear that the School District's restrictions were applied neutrally "given the fact that materials for activities hosted by third-parties frequently went home with students." *Id.* The District Court also noted that "the Superintendent's elusive criteria for determining which materials could be distributed is simply too broad and vague to be considered reasonable," as "[t]he Superintendent's

10

'unfamiliarity' with a given organization – without any procedure for establishing 'familiarity' – is a criteria ripe for abuse." *Id.* The District Court further observed that the revised Policy 913 was also unconstitutional, since "[a]n across the board ban on any type of 'solicitation,' given the established vagaries of that term, clearly runs afoul of both *Tinker* and a nonpublic forum analysis." *Id.*

The District Court denied the School District's motion for reconsideration. The District Court held that the School District's reliance on *Morse v. Frederick*, 551 U.S. 393 (2007), was misplaced, because "[t]he flyers distributed by K.A. contain quite a different message from the banner unfurled by the student in *Morse*," as the former was "religious literature" while the latter was "'just nonsense meant to attract television cameras.'" *K.A.*, 2012 WL 715304, at *2 (quoting *Morse*, 551 U.S. at 401). The School District timely appealed.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331, and we have appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## A.

"We employ a tripartite standard of review for . . . preliminary injunctions. We review the District Court's findings of fact for clear error. Legal conclusions are assessed de novo. The ultimate decision to grant or deny the injunction is reviewed for abuse of discretion." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 252 (3d Cir.

11

2002) (citing *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 170 (3d Cir. 2001)).

The decision to issue a preliminary injunction is governed by a four-factor test:

> To obtain an injunction, the plaintiffs had to demonstrate (1) that they are reasonably likely to prevail eventually in the litigation and (2) that they are likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest.

*Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002) (citation omitted).

### B.

The main issue in this appeal is the first prong of the preliminary injunction test: whether K.A. has demonstrated that she is reasonably likely to prevail in the litigation. This requires that we first examine the legal standard applied by the District Court to K.A.'s First Amendment claim.

12

1.

First Amendment claims are generally examined through the lens of forum analysis, under which "the Government's interest in limiting the use of its property to its intended purpose" is weighed against "the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *see also Christian Legal Soc'y Chapter of the Univ. of Cal. Hastings Coll. of the Law v. Martinez*, 130 S. Ct. 2971, 2984 (2010) ("[I]n a progression of cases, this Court has employed forum analysis to determine when a government entity, in regulating property in its charge, may place limitations on speech."). Under forum analysis, regulations of speech in public forums such as sidewalks and parks are "subject to the highest scrutiny" and "survive only if they are narrowly drawn to achieve a compelling state interest," while identical regulations in nonpublic forums such as prisons and *public schools* "must survive only a much more limited review," and "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992).

In the student-speech context, however, the leading case is *Tinker*, where the Supreme Court affirmed that students "do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506. The Court held that, while in school, a student "may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfer(ing) with the requirements of

13

appropriate discipline in the operation of the school' and without colliding with the rights of others." 393 U.S. at 513 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)).

Under *Tinker* many "reasonable" speech regulations in our public schools that would survive constitutional scrutiny under nonpublic forum analysis would not pass muster because such restrictions infringe on a student's ability to express her opinions in a way that would not disrupt or interfere with the rights of others. The critical distinction is the identity of the speaker. *Tinker* and its progeny plainly apply to student expression. *See J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 927 (3d Cir. 2011) (en banc) ("As this Court has emphasized, with then-Judge Alito writing for the majority, *Tinker* sets the general rule for regulating school speech . . . ." (citing *Saxe*, 240 F.3d at 212)); *see also Saxe*, 240 F.3d at 211 ("Under *Tinker*, then, regulation of student speech is generally permissible only when the speech would substantially disrupt or interfere with the work of the school or the rights of other students."). Forum analysis, on the other hand, generally applies to the rights of outsiders who attempt to speak in our public schools. *See Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 333-37 (8th Cir. 2011) (applying forum analysis to regulations that barred non-profit organization from participating in school district's "Backpack Flyers for Students" program); *Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 526-30 (3d Cir. 2004) (applying forum analysis to school district regulations that barred religious organization from disseminating materials and staffing informational table at school events).

14

To be sure, the Supreme Court has made clear in the context of student speech that "the mode of analysis set forth in *Tinker* is not absolute." *Morse*, 551 U.S. at 405. Specifically, the Court has held that a student's First Amendment rights may be circumscribed "'in light of the special characteristics of the school environment.'" *Id.* (quoting *Tinker*, 393 U.S. at 506). In this regard, the Court has recognized several "narrow categories of speech that a school may restrict even without the threat of substantial disruption." *Saxe*, 240 F.3d at 212. In *Bethel School Disrict No. 403 v. Fraser*, 478 U.S. 675 (1986), the Court held that schools may restrict the manner in which a student conveys his message by forbidding and punishing the use of lewd, vulgar, indecent, and plainly offensive speech. *Id.* at 680-86. Next, in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), the Court found that school officials may regulate speech that is school-sponsored or can reasonably be viewed as the school's own speech. *Id.* at 273. Most recently, in *Morse*, the Court held that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." 551 U.S. at 397.

In none of these cases was the school first required to show that the speech would "materially and substantially disrupt the work and discipline of the school," *Tinker*, 393 U.S. at 513, as *Tinker* had established. *See Saxe*, 240 F.3d at 212-13. Instead, in each case, the Court identified certain vital interests that enable school officials to exercise control over student speech even in the absence of a substantial disruption. *See Morse*, 551 U.S. at 408 (noting "the special characteristics of the school environment, and the

15

governmental interest in stopping student drug abuse . . . allow schools to restrict student expression that they reasonably regard as promoting illegal drug use" (citation and internal quotation marks omitted)); *Hazelwood*, 484 U.S. at 271 ("Educators are entitled to exercise greater control over [school-sponsored publications] to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school."); *Fraser*, 478 U.S. at 681 ("The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."). Nonetheless, in the absence of a showing of such vital interests, the *Tinker* material risk of substantial disruption test is the standard against which regulation of student expression on school grounds is to be judged.

This appeal presents the question of the extent to which *Tinker* applies in the elementary school context. In particular, this appeal raises the issue of whether the age-related developmental, disciplinary and educational concerns specific to elementary school students present the type of vital interests to school administration that render *Tinker* analysis inapplicable. This appeal also presents the question of whether forum analysis trumps *Tinker* when the elementary school student is distributing materials prepared by an outside organization. We answer each question in the negative.

2.

Neither the Supreme Court nor our Court has definitively addressed the question of the extent to which *Tinker* applies in the elementary school context. Our prior precedents, however, have raised questions about application of the *Tinker* material risk of substantial disruption test to elementary school student speech.

Our strongest statement in this regard appears in *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412 (3d Cir. 2003). In that case, a teacher told a third-grade student that she could not circulate during instructional time or recess a petition objecting to a school trip to the circus. *Id.* at 414. The student was, however, later permitted to pass out coloring books and stickers which dealt with cruelty to circus animals. *Id.* Before affirming the district court's dismissal of the plaintiff's First Amendment claim, we explicitly questioned the applicability of *Tinker* to student speech in elementary schools:

> Instilling appropriate values is a primary goal for our public schools, one that is especially important in the earlier grades. Accordingly, young students demand a far greater level of guidance-guidance that is fundamental to our public schools' mission.

> That age is a crucial factor in this calculus does not necessar[il]y mean that third graders do not have First Amendment rights under *Tinker*. *Tinker* provides a flexible standard that arguably is able to incorporate these considerations. *Tinker* permits school regulation of student speech whenever the school can show that the speech

17

would be disruptive, or would interfere with the rights of other students. In essence, *Tinker* requires that schools have a legitimate educational or disciplinary justification for regulating student expression. That elementary schools require a greater degree of control, or a different kind of control, over students might be accommodated within the *Tinker* analysis. At the very least, anything that interferes with the legitimate educational and disciplinary functions of elementary schools could be regulated under *Tinker.*

. . . .

Nonetheless, at a certain point, a school child is so young that it might reasonably be presumed the First Amendment does not protect the kind of speech at issue here. Where that point falls is subject to reasonable debate.

*Id.* at 417. Thus, while acknowledging the reality that the risk of disruption of educational and disciplinary functions may be different depending upon the age and maturity of the students, *Walker-Serrano* did not hold that *Tinker* analysis has no place in the elementary school setting.

In *Walz ex rel. Walz v. Egg Harbor Township Board of Education*, 342 F.3d 271 (3d Cir. 2003), we again acknowledged that "[i]n the elementary school setting, age and context are key." *Id.* at 275. Furthermore, we noted that "the age of the students bears an important inverse relationship to the degree of control a school may exercise: as a general matter, the younger the students, the more control a

school may exercise." *Id.* at 276. And in *S.G. ex rel A.G. v. Sayreville Board of Education*, 333 F.3d 417, 423 (3d Cir. 2003), we observed that "a school's authority to control student speech in an elementary school setting is undoubtedly greater than in a high school setting." *See also Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 101 (3d Cir. 2009) (Barry, J., concurring) (lamenting the fact that "while recognizing the crucial importance of age in determining the extent of the First Amendment's protections . . . [we] continue to scrutinize and analyze purported violations of the First Amendment rights of children at the pre-K and kindergarten levels").

Yet, in none of these cases did we find that *Tinker's* material risk of substantial disruption test must be abandoned in the elementary school context. On the contrary, our prior precedents seem to recognize that the *Tinker* test has the requisite flexibility to accommodate the age-related developmental, educational, and disciplinary concerns of elementary school students.

The School District relies upon the Seventh Circuit's decision in *Muller by Muller v. Jefferson Lighthouse School*, 98 F.3d 1530 (7th Cir. 1996), to argue that *Tinker* does not apply in the elementary school context. In that case, a fourth-grader requested permission from his elementary school's principal to hand out invitations to a religious meeting to be held at the church his family attends. The principal denied the request, and the fourth-grader's family sued. Significantly, the District Court found that the policies at issue in that case, as applied, abridged the student's First Amendment rights and enjoined the school officials from prohibiting the student's distribution of the invitations. This

19

holding by the District Court was not challenged on appeal. *See id.* at 1535 ("Neither party contests the court's as-applied ruling."). In the matter sub judice, the District Court similarly enjoined the School District "from enforcing [Policy] 913 *as applied* to prohibit Plaintiff from distributing literature promoting religious events and activities . . . ." *K.A.*, 2011 WL 5008358, at *5 (emphasis added). Thus, the "as applied" ruling by the District Court in *Muller* is consistent with the result here.

It was in the context of the facial challenge to the school's policies in *Muller* that the Seventh Circuit considered whether *Tinker* or forum analysis was appropriate in the elementary school context. While one member of the *Muller* panel, Judge Manion, opined that "it is unlikely that *Tinker* and its progeny apply to public elementary (or preschool) students" due to "the important role age plays in student speech cases," he was not joined by the other members of the panel in this assertion.[3] *Muller*, 98 F.3d at

---

[3] Judge Eschbach "concur[red] in all respects with the court's opinion *except for Part II*," where Judge Manion had considered the applicability of *Tinker*. *Muller*, 98 F.3d at 1545 (Eschbach, J., concurring) (emphasis added). As Judge Eschbach explained, because the panel majority had chosen to decide the matter under forum analysis, "[i]t is unnecessary . . . for this court to speculate that the free speech rights elaborated in the *Tinker* line of cases do not extend to elementary school children." *Id.* Judge Rovner, meanwhile, resisted the application of forum analysis, and "disagree[d] with the suggestion that the standard articulated in *Tinker* is unlikely to apply to grammar school students." *Id.* at 1546 (Rovner, J., concurring in part and in the judgment).

1539. Furthermore, Judge Manion retreated from this tentative conclusion in the very next sentence of his opinion, writing that "because the Supreme Court has not directly decided this question, the following analysis will assume that grade schoolers partake in certain of the speech rights set out in the *Tinker* line of cases." *Id.* The *Muller* court ultimately held that the elementary school was a nonpublic forum, noting that "[e]ven assuming *Tinker* expression rights apply to children in public elementary schools, an elementary school's nonpublic forum status remains, and we apply the most recent standard elaborated by the Supreme Court in *Hazelwood*, that of 'reasonableness.'" *Id.* at 1540.

We do not agree with the *Muller* court's application of forum analysis in this context, and as Judge Rovner explains in her concurrence, the court's reliance on *Hazelwood* and the standard set forth therein, was misplaced. *Id.* at 1546 (Rovner, J., concurring). *Hazelwood's* use of forum analysis is limited to cases where the student speech at issue bears the imprimatur of the school. 484 U.S. at 271-73; *see also Saxe*, 240 F.3d at 213-14 (explaining that "*Hazelwood's* permissive 'legitimate pedagogical concern' test governs only when a student's school-sponsored speech could reasonably be viewed as speech of the school itself"). Because the student speech at issue in *Muller* was not school-sponsored speech, its reliance on *Hazelwood* and its use of forum analysis was misguided.[4] Instead, *Tinker's* "more searching review," *Muller*, 98 F.3d at 1546 (Rovner, J., concurring), provides the

---

[4] We also note that *Muller* engaged in forum analysis because it adopted the standard set out in *Hazelwood*, not because of any distinction it drew between speech that originated with the student or from an outside source.

21

requisite analytic framework for even an elementary school student's speech or expression.

The School District persists that if *Tinker* applies in the context presented here, *Walker-Serrano* supports use of a "limited" *Tinker* analysis. In *Walker-Serrano*, we stated:

> [I]f third graders enjoy rights under *Tinker*, those rights will necessaryily be very limited. Elementary school officials will undoubtedly be able to regulate much – perhaps most – of the speech that is protected in higher grades. When officials have a legitimate educational reason – whether grounded on the need to preserve order, to facilitate learning or social development, or to protect the interests of other students – they may ordinarily regulate public elementary school children's speech.

325 F.3d at 417-18. This passage from *Walker-Serrano* is, however, dicta. Moreover, we did not say in *Walker-Serrano* that the *Tinker* test of material risk of substantial disruption will not work effectively in the elementary school context. Indeed, *Walker-Serrano* – albeit also in dicta – recognized that "*Tinker* provides a flexible standard that arguably is able to incorporate [age-related] considerations." *Walker-Serrano*, 325 F.3d at 417. We thus understand *Walker-Serrano* to suggest that *Tinker* analysis can apply even in the elementary school context.[5]

---

[5] Although in *Walker-Serrano*, we analyzed the applicability of *Tinker* to elementary school students, we decided the case on other grounds — that there was no

22

In *Walker-Serrano*, we noted that at that time, no other Court of Appeals had ruled on the applicability of *Tinker* in the elementary school context. 325 F.3d at 416. However, since *Walker-Serrano* was decided, the Fifth Circuit, sitting en banc, has held that *Tinker* applies to elementary school student speech. *See Morgan v. Swanson*, 659 F.3d 359, 407-09 (5th Cir. 2011) (en banc) (Elrod, J., writing for the majority on this point) (applying *Tinker's* "substantial disruption" standard to elementary school student speech to find viewpoint discrimination unconstitutional). Writing separately, Judge Benavides explained, "[a]s a preliminary matter, because it has been unclear, it should be clarified today that the student-speech rights announced in *Tinker* inhere in the elementary school context. It is difficult to identify a constitutional justification for cabining the First Amendment protections announced in *Tinker* to older students." *Id.* at 385-86. We agree with this conclusion, and hold that the *Tinker* analysis has sufficient flexibility to accommodate the educational, developmental, and disciplinary interests at play in the elementary school environment.

3.

violation of the student's First Amendment rights because she was never punished, and because the school provided other outlets for her to express her opposition to the school field trip. 325 F.3d at 418-19 ("Regardless of the extent the *Tinker* analysis is properly employed in the elementary school context, the record here does not support a First Amendment violation claim."). Therefore, the discussion on the applicability of the *Tinker* analysis to elementary school students in *Walker-Serrano* did not form part of our holding.

While the School District may have identified an interesting distinction in this case – that the invitation originated from the Innovation Church, not K.A. – it has failed to identify any persuasive authority that states that this distinction changes the analytical framework to forum analysis. The speaker is still K.A., and not the Innovation Church. Even in *Muller*, the fact that the invitation originated from an outside organization rather than the student himself did not dictate use of forum analysis. 98 F.3d at 1545 ("The Code . . . is a facially reasonable tool for ensuring that *student-sponsored publications* do not interfere with the school's critical educational mission." (emphasis added)). And, as noted above, the school officials in *Muller* were enjoined from prohibiting distribution of the religious-themed invitations. *Id.* ("Andrew's right not to have his expression suppressed solely because it is religious was vindicated in the district court and not appealed by defendants.").

Furthermore, we have applied *Tinker* even in cases where it appeared the speech originated from an outside source rather than the student. In *Walz*, for example, we noted that:

> Daniel was in pre-kindergarten when he brought the "Jesus [Loves] The Little Children" pencils to the holiday party. *Furthermore, Dana Walz appears to have driven her son's activity and this litigation. Although we doubt whether the distribution of the pencils constituted Daniel's*

24

> *own expression, other courts have*
> *recognized that a student of*
> *similar age can understand and*
> *interpret basic principles of*
> *religious expression.*

342 F.3d at 275 (emphasis added) (citing *Wallace v. Jaffree*, 472 U.S. 38, 42 (1985)); *DeSpain v. DeKalb Cnty. Comm. Sch. Dist.*, 384 F.2d 836, 837 (7th Cir. 1967)). Despite this observation, we conducted no forum analysis in *Walz.* Instead, we quoted *Tinker* and based our analysis on the premise that "elementary school students retain certain First Amendment rights of expression." *Id.* at 276, 280 (citing *Wallace*, 472 U.S. at 42).[6]

As we observed in *J.S.*, "*Tinker* sets the general rule for regulating school speech, and that rule is subject to several *narrow* exceptions." *J.S.*, 650 F.3d at 927 (citing *Saxe*, 240 F.3d at 212). The District Court correctly held that K.A.'s speech does not fall into any of these exceptions. It is not

---

[6] However, we relied on *Hazelwood* in determining that the school was justified in restricting the student's distribution of the pencils because in seeking to hand them out, he "controvert[ed] the rules of a structured classroom activity with the intention of promoting an unsolicited message." *Walz*, 342 F.3d at 280. We explained that "where an elementary school's purpose in restricting student speech *within an organized and structured educational activity* is reasonably directed towards preserving its educational goals, we will ordinarily defer to the school's judgment." *Id.* at 277-78 (emphasis added).

"lewd, vulgar or profane" under *Fraser*. *Saxe*, 240 F.3d at 214. It is not "school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech)" under *Hazelwood*. *Id.*[7] And it is not "promoting illegal drug use." *Morse*, 551 U.S. at 402. "Speech falling outside of these categories . . . may be regulated only if it would

---

[7] The School District's reliance on *Perry Education Ass'n. v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983), misses this fundamental distinction between school-sponsored speech and an individual student's own speech. The Supreme Court stated in *Hazelwood* that *Perry*, "rather than our decision in *Tinker* . . . governs this case," because a school newspaper is "a supervised learning experience for journalism students" and an "expressive activit[y] that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." 484 U.S. at 270-71. As the *Hazelwood* Court explained, "[t]he question whether the First Amendment requires a school to tolerate particular student speech − the question that we addressed in *Tinker* − is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech." *Id.* *Hazelwood* drew a line between student speech and school-sponsored speech: while *Tinker* applied to the former, *Perry* and *Hazelwood* applied to the latter. We recognized this distinction in *Saxe*: "*Hazelwood*'s permissive 'legitimate pedagogical concern' test governs only when a student's school-sponsored speech could reasonably be viewed as speech of the school itself . . . ." 240 F.3d at 213-14 (citing *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995)). Because school-sponsored speech is not at issue here, *Tinker* governs, and the School District's reliance on *Perry* is misplaced.

substantially disrupt school operations or interfere with the right[s] of others." *Saxe*, 240 F.3d at 214.

Because K.A.'s speech did not fall within any of the categories that obviate the material risk of substantial disruption test, the District Court correctly chose not to employ forum analysis. The fact that K.A. was only in the fifth-grade and the invitation originated from her church does not mandate a different approach.

C.

We now evaluate whether K.A. has demonstrated that she is reasonably likely to prevail in this litigation under the *Tinker* standard.

As we explained in *Walker-Serrano*: "*Tinker* permits school regulation of student speech whenever the school can show that the speech would be disruptive, or would interfere with the rights of other students." 325 F.3d at 417. At most, the School District justifies its regulation by arguing that the Innovation Church is "a nonschool organization with which the School District has no familiarity." (Reply Br. at 8-9.) The School District makes no argument whatsoever in this appeal that K.A.'s speech was "disruptive, or would interfere with the rights of other students." *Walker-Serrano*, 325 F.3d at 417.

Instead, the School District argues that it does not have to make such a showing because this Court stated in *Walker-Serrano* that "[a]bsent punishment for expression, a significant pattern of concrete suppression, or some other form of clear suppression of the expression of elementary

school students, a federal First Amendment action is not an appropriate forum for resolution of disputes over schools' control of third graders' conduct." *Id.* at 419. The School District claims that K.A. was never punished for her attempt to distribute the flyers, and that she was never discouraged from expressing her religious faith. This standard from *Walker-Serrano* can be easily distinguished. In that case:

> [N]ot only did Walker-Serrano collect over thirty signatures on her petition, she was never punished for this activity. Furthermore, the school authorities encouraged and permitted her to express her views in what they properly regarded as a pedagogically appropriate manner. As in *Fraser,* "[t]here is no suggestion that school officials attempted to regulate [Walker-Serrano's] speech because they disagreed with the views [she] sought to express. Nor does this case involve an attempt by school officials to ban written materials they consider 'inappropriate' for [elementary] school students, or to limit what students should hear, read, or learn about." Therefore, the record does not permit a finding that Walker-Serrano suffered an injury of constitutional dimension.

*Id.* (quoting *Fraser*, 478 U.S. at 689 (Brennan, J., concurring)). The facts here are markedly different: unlike Walker-Serrano, K.A. was not allowed to distribute her invitation – a "clear suppression of" her expression. *Id.*[8]

Accordingly, the School District's failure in this appeal to identify any disruption caused by K.A.'s invitation, makes it reasonably likely that K.A. will prevail in this litigation.[9] The District Court did not err in finding that the first prong of the preliminary injunction test was satisfied.

We also hold that the original and revised versions of Policy 220 and 913 are unconstitutional as applied to the form of student expression at issue here. Under either Policy 220 or 913, "[o]nly literature and materials directly related to school district activities or that contribute significantly to district instructional programs may be disseminated to or through students and staff members." (Appellee's Br. Addendum 2, 4.) These policies are broader than what is

---

[8] Moreover, under Policies 913 and 220, K.A. is prohibited from distributing *any* invitation to a church-sponsored event on school grounds, even to a single student.

[9] No evidence was presented that the flyers were likely to cause K.A. to be held up to ridicule or bullying. Nor was there evidence that distribution of the flyers would disrupt the school environment. K.A. only sought to distribute the flyers during non-instructional time. Finally, the School District did not present any evidence to suggest that there would be a misperception that the school was sponsoring a religious-themed gathering of students.

allowed under *Tinker* and its progeny, which state that student expression can be regulated only if it causes disruption or interferes with the rights of others, or if it falls into one of the narrow exceptions to this rule (i.e., it is lewd, it promotes illegal drug use, or it is school-sponsored). *See J.S.*, 650 F.3d at 926-27.

D.

K.A. also satisfies the other three prongs of the preliminary injunction test. First, K.A. will suffer irreparable injury without an injunction, because as the Supreme Court held in *Elrod v. Burns*, 427 U.S. 347 (1976), "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373-74 (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam)).

Second, we fail to see how any harm results to the School District because of the preliminary injunction. The School District claims it "would be essentially required to maintain an open forum for the distribution of nonschool solicitation materials via an elementary school conduit," and that "nonschool organization[s] would use children for the distribution of materials to evade School District review and approval under Policy 913." (Appellant's Br. at 39.) We observe that the School District can still regulate the distribution of materials under the *Tinker* standard. If a student distributed materials during instructional time, for example, or was otherwise disruptive or interfering with the rights of other students, the School District would remain free to regulate such speech. In this particular instance, however, the School District failed to identify any disruption caused by

K.A.'s invitation.  As such, the injunction does not harm the School District more than denying relief would harm K.A.

Lastly, we hold that granting preliminary injunctive relief here is in the public interest because the enforcement of an unconstitutional law vindicates no public interest.  *See ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." (citation and international quotation marks omitted)).

Accordingly, the District Court did not abuse its discretion in granting a preliminary injunction.

### III.

For the foregoing reasons, we will affirm the District Court's Order.