**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1887
_____

DELAWARE STRONG FAMILIES, a Delaware nonprofit
corporation

v.

ATTORNEY GENERAL OF THE STATE OF
DELAWARE, in his official capacity as Attorney General of
the State of Delaware; COMMISSIONER OF ELECTIONS,
in her official capacity as State Commissioner of Elections
Appellants
_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE DISTRICT OF DELAWARE
(D.C. Civ. No. 1-13-cv-01746)
District Judge:  Honorable Sue L. Robinson
_____

Argued October 28, 2014
_____

Before: MCKEE, *Chief Judge*, GREENAWAY, JR., and
KRAUSE, *Circuit Judges*

(Opinion Filed:  July 16, 2015)

Jonathan G. Cedarbaum, Esq.   [ARGUED]
Seth P. Waxman, Esq.
Wilmer Hale
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

Joseph C. Handlon, Esq.
Aleph A. Woolfolk, Esq.
Delaware Department of Justice
820 North French Street
Carvel Office Building, 6th Floor
Wilmington, DE 19801
        *Counsel for Appellant*

Allen J. Dickerson, Esq.   [ARGUED]
Zachary R. Morgan, Esq.
Center for Competitive Politics
124 South West Street, Suite 201
Alexandria, VA 22314

David E. Wilks, Esq.
Wilks, Lukoff & Bracegirdle
1300 North Grant Street, Suite 100
Wilmington, DE 19806
        *Counsel for Appellee*

David B. Hird, Esq.
Weil, Gotshal & Manges

1300 Eye Street, N.W., Suite 900
Washington, DC 20005
    *Counsel for Amicus Appellants League of Women Voters of Delaware and Common Cause*

James Bopp., Jr., Esq.
James Madison Center for Free Speech
1 South Sixth Street
Terre Haute, IN 47807

Randy Elf, Esq.
James Madison Center for Free Speech
P.O. Box 525
Lakewood, NY 14750
    *Counsel for Amicus Appellee James Madison Center for Free Speech*

Heidi K. Abegg, Esq.
Webster, Chamberlain & Bean
1747 Pennsylvania Avenue, N.W., Suite 1000
Washington, DC 20006
    *Counsel for Amicus Appellees United States Constitutional Rights Legal Defense*
        *Fund and National Right to Work Committee*

_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

This case requires us to decide whether the Delaware Elections Disclosure Act (the "Act") is constitutional as applied[1] to a 2014 Voter Guide ("Voter Guide") that Appellee Delaware Strong Families ("DSF") intended to produce and distribute. DSF's Complaint seeks a declaratory judgment that the Act's disclosure provisions are unconstitutional and a preliminary injunction preventing enforcement of the Act. The United States District Court for the District of Delaware ("District Court") granted the preliminary injunction declaring that the Act's disclosure requirements are unconstitutional. Because the Act is narrowly tailored and not impermissibly broad we will reverse the District Court and remand for entry of judgment in favor of Appellants.

## I.    BACKGROUND

On October 23, 2013, DSF filed a Complaint alleging both facial and as-applied challenges to the Act.[2]   DSF

---

[1]    DSF initially brought the instant action arguing overbreadth and vagueness. The District Court concluded that the Act was unconstitutional as applied to DSF; therefore, it did not reach the facial challenge. *Del. Strong Families v. Biden*, 34 F. Supp. 3d 381, 394 (D. Del. 2014).

[2]    The lawyers representing DSF in this appeal filed similar complaints in Colorado and Washington D.C.

planned to distribute the 2014 Voter Guide over the internet within sixty days of Delaware's general election and planned to spend more than $500 on its creation and distribution. [3] The State of Delaware ("State") filed an answer and issued various discovery requests. DSF moved for a protective order and preliminary injunction. The District Court denied DSF's motion for a protective order and instructed the parties to submit briefs addressing whether the Act is constitutional. J.A. 5–6. On March 31, 2014, Judge Robinson issued an opinion granting a preliminary injunction against Appellants and, on April 8, 2014, entered an order granting DSF's motion for a preliminary injunction. *Id.* at 4. This appeal followed.

---

[3] The proposed 2014 Voter Guide is not part of the record. However, in its Complaint DSF alleges that "[i]n 2014, DSF plans to produce and disseminate voter guides in a manner substantively similar to the process used in 2012." J.A. 45. The 2012 Voter Guide lists a series of statements concerning, inter alia, "[a] Single Payer Healthcare System"; adding gender identity to the protected classes in Delaware law; "[s]trengthening and maintaining marriage as the union of one man and one woman"; and "[p]rohibit[ing] coverage for abortion in the state insurance exchanges mandated by the new federal health care law." J.A. 61–64. It also lists all Delaware federal and state candidates and their respective stances in support of or opposition to each statement. The answers were provided by the candidates themselves or, if no response was submitted, were gleaned from the candidates' "voting records, public statements, and/or campaign literature." J.A. 61. In its Brief, DSF states that: "In 2014, DSF will . . . distribute this same voter guide, updated to apply to the upcoming election." Appellee Br. at 15.

In 2012, DSF disseminated its 2012 Voter Guide without having to disclose its donors. However, enactment of the Act on January 1, 2013, changed the relevant disclosure requirements. The Act requires "[a]ny person . . . who makes an expenditure for any third-party advertisement that causes the aggregate amount of expenditures for third-party advertisements made by such person to exceed $500 during an election period [to] file a third-party advertisement report with the Commissioner." 15 Del. C. § 8031(a).

The Act defines a "third-party advertisement" in part as "an electioneering communication." *Id.* § 8002(27). An electioneering communication is:

> a communication by any individual or other person (other than a candidate committee or a political party) that: 1. Refers to a clearly identified candidate; and 2. Is publicly distributed within 30 days before a primary election . . . or 60 days before a general election to an audience that includes members of the electorate for the office sought by such candidate.

*Id.* § 8002(10)(a). The "third-party advertisement report" must include "[t]he full name and mailing address of each person who has made contributions to [DSF] during the election period in an aggregate amount or value in excess of $100." *Id.* § 8031(a)(3). Disclosure is not limited to individuals who earmarked their donations to fund an electioneering communication.

The Act's application here is undisputed since the Voter Guide: 1) meets the definition of "electioneering

communication," 2) would be distributed on the internet within the sixty days prior to Delaware's general election, and 3) would cost DSF more than $500 to produce.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331 and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).  We exercise plenary review over a challenge to the constitutionality of a statute.  *United States v. Pendleton*, 636 F.3d 78, 82 (3d Cir. 2011).  In reviewing the grant or denial of a preliminary injunction, we employ a "tripartite standard of review":  findings of fact are reviewed for clear error, legal conclusions are reviewed de novo, and the decision to grant or deny an injunction is reviewed for abuse of discretion.  *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013).  "The decision to issue a preliminary injunction is governed by a four-factor test." *Id.*  The plaintiff must show:  1) likelihood of success on the merits; 2) that he is likely to suffer irreparable harm; 3) that denying relief would injure the plaintiff more than an injunction would harm the defendant; and 4) that granting relief would serve the public interest.  *Id.*

## III.    ANALYSIS

We first address the District Court's erroneous conclusion that the Act's disclosure requirements are unconstitutionally broad by virtue of reaching "neutral communication[s]" by "neutral communicator[s]."  *Del. Strong Families*, 34 F. Supp. 3d at 395.  We then turn to the relevant Supreme Court precedent, which analyzed the federal statute comparable to the Act — the Bi-Partisan Campaign Reform Act ("BCRA") — and compare the

respective disclosure requirements of BCRA and the Act to determine whether the Act survives constitutional scrutiny.

## A. Advocacy and the Voter Guide

Campaign finance jurisprudence uses the terms "express advocacy" and "issue advocacy" to describe different types of election-related speech. The former encompasses "communications that expressly advocate the election or defeat of a clearly identified candidate," *Buckley v. Valeo*, 424 U.S. 1, 80 (1976), while the latter are communications that seek to impact voter choice by focusing on specific issues. The Supreme Court has consistently held that disclosure requirements are not limited to "express advocacy" and that there is not a "rigid barrier between express advocacy and so-called issue advocacy." *McConnell v. FEC*, 540 U.S. 93, 193 (2003). Any possibility that the Constitution limits the reach of disclosure to express advocacy or its functional equivalent is surely repudiated by *Citizens United v. FEC*, which stated: "The principal opinion in [*FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469–76 (2007)] limited . . . restrictions on independent expenditures to express advocacy and its functional equivalent. Citizens United seeks to import a similar distinction into BCRA's disclosure requirements. We reject this contention." 558 U.S. 310, 368 (2010).

The District Court concluded that the Act's disclosure requirements could not constitutionally reach DSF's Voter Guide because it was a "neutral communication" by a "neutral communicator." *Del. Strong Families*, 34 F. Supp. 3d at 395. This formulation finds no support in the case law and is not one that we choose to adopt. The District Court found that DSF was a presumed neutral communicator by

8

virtue of its status as a § 501(c)(3) organization. *Id.* Similarly, DSF argues in its reply brief that, by virtue of this status, it is not permitted to engage in "any political campaign on behalf of or in opposition to any candidate for public office." 26 C.F.R. § 1.501(c)(3)-1(b)(3)(ii). The Act and § 501(c)(3), however, are separate and unrelated, and DSF has offered no compelling reason to defer to the § 501(c)(3) scheme in determining which communications require disclosure under the Act. Accordingly, we conclude that it is the conduct of an organization, rather than an organization's status with the Internal Revenue Service, that determines whether it makes communications subject to the Act.

The District Court noted that voter guides are typically intended to influence voters even though they may "lack[] words of express advocacy." *Del. Strong Families*, 34 F. Supp. 3d at 394 n.19. By selecting issues on which to focus, a voter guide that mentions candidates by name and is distributed close to an election is, at a minimum, issue advocacy. Thus, the disclosure requirements can properly apply to DSF's Voter Guide, which falls under the Act's definition of "electioneering communication" by, among other things, mentioning candidates by name close to an election. *See* 15 Del. C. § 8002(10)(a); *see also McConnell*, 540 U.S. at 196 (endorsing the application of disclosure requirements to the "entire range" of similarly-defined "electioneering communications"). As long as the Act survives exacting scrutiny, disclosure of DSF's donors is constitutionally permissible.

Because it concluded that the Act impermissibly reached DSF's Voter Guide as a general matter, the District Court did not analyze the Act's specific requirements to determine whether it is sufficiently tailored to pass

9

constitutional muster. It is this analysis that we engage in next.

### B.      Exacting Scrutiny

Acknowledging the interest in one's privacy of association, the Supreme Court in *Buckley* announced that campaign finance disclosure requirements are reviewed under "exacting scrutiny." 424 U.S. at 64–68. This is a heightened level of scrutiny, which accounts for the general interest in associational privacy by requiring a "'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, 558 U.S. at 366–67 (quoting *Buckley*, 424 U.S. at 64, 66).[4]

DSF acknowledges that Delaware's interest in an informed electorate is a sufficiently important governmental interest. Appellee Br. at 50. "[D]isclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek [] office." *Buckley*, 424 U.S. at 66–67. The Supreme Court endorsed this interest in *Buckley*, 424 U.S. at 81 (stating "disclosure helps voters to define more of the candidates' constituencies"), and has reiterated its importance, *see*

---

[4]      Exacting scrutiny differs from "strict scrutiny" — the most demanding level of scrutiny applied in the First Amendment context — in that it does not engage in a "least-restrictive-alternative analysis." *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 798 n.6 (1989). Strict scrutiny is reserved for restrictions on speech that are content or viewpoint based. *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014).

*McConnell v. FEC*, 540 U.S. 93, 196 (2003) (countenancing the government's informational interest and rejecting a challenge to BCRA's disclosure provisions); *Citizens United*, 558 U.S. at 371 (stating that "disclosure permits citizens . . . . to make informed decisions and give proper weight to different speakers and messages"); *see also Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010) ("Providing information to the electorate is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment."). Therefore, we find that Delaware's interest in an informed electorate is sufficiently important.

We now turn to the specific sections of the Act that DSF alleged in its Complaint were impermissibly broad[5] and

---

[5] For the first time on appeal, DSF argued that the Act's "election period" is impermissibly long. The election period is essentially a "look back" period, requiring disclosure of donors who made donations during this defined time. In keeping with the "general rule," we will "not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). Even were we to reach this argument, it would not alter our conclusion. It is true that the Act's election period will generally be longer than BCRA's. *Compare* 52 U.S.C. § 30104(f)(2)(F) (defining the election period as "beginning on the first day of the preceding calendar year and ending on the disclosure date"), *with* 15 Del. C. § 8002(11)(3) (stating that "the election period shall begin and end at the same time as that of the candidate identified in such advertisement"). We do not, however, find material to our analysis the difference between the Act's

11

therefore did not bear a substantial relation to the Act's disclosure requirements, to wit: the monetary threshold and the type of media covered. As noted above, the Supreme Court's guidance in upholding BCRA's disclosure provision under exacting scrutiny is particularly applicable to this case. The Act's disclosure requirements are similar in structure and language to those of the analogous federal law. Thus, in applying exacting scrutiny to the Act's disclosure requirements, we will examine similar aspects of BCRA that the Court has upheld and consider whether the Act's deviations from BCRA change the exacting scrutiny analysis.

### 1. Monetary Threshold

In *Buckley*, the Supreme Court stated that deciding where to locate a monetary threshold "is necessarily a judgmental decision, best left . . . to congressional discretion" and determined that the thresholds presented were not "wholly without rationality." 424 U.S. at 83 (discussing thresholds for direct contributor disclosure). Thus, even though election disclosure laws are analyzed under exacting scrutiny, we apply less searching review to monetary thresholds — asking whether they are "rationally related" to the State's interest. *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 60 (1st Cir. 2011) (citing *Buckely* and stating that "judicial deference [is granted] to plausible legislative judgments as to the appropriate location of a reporting threshold . . . unless they are wholly without rationality") (quotation marks and internal citation omitted); *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1251–52 (9th Cir. 2013)

---

potential four year look-back and BCRA's potential two year look-back period.

(same analysis of monetary thresholds in the political action committee context); *Family PAC v. McKenna*, 685 F.3d 800, 811 (4th Cir. 2012) (same).

Under BCRA,[6] groups that spend in excess of $10,000 annually must report individual contributors of $1,000 or more. 52 U.S.C. § 30104(f)(1), (2)(F). Under the Act, groups that spend more than $500 annually must report individual contributors of $100 or more. 15 Del. C. § 8031(a)(3). It is unsurprising that Delaware's thresholds are lower than those for national elections. Delaware is a small state where direct mail makes up 80% of campaign expenditures. J.A. 135. "[F]or less than $500 a campaign can place enough pre-recorded 'robo-calls' to reach every household in a Delaware House district. If a hyper-targeted recipient list is used, as is common in campaigns, $150 would suffice." J.A. 137. The expenditure thresholds are supported by the record and are rationally related to Delaware's unique election landscape.

## 2. Type of Media Covered

BCRA defines "electioneering communication" as "any broadcast, cable, or satellite communication," 52 U.S.C. § 30104(f)(3)(A)(i), except the following: "a communication appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station, unless such facilities are owned or controlled by any political

---

[6] As of September 1, 2014, the relevant provisions of BCRA were transferred from 2 U.S.C. § 437 to 52 U.S.C. § 30104. We use the updated citations, but note, in the interest of clarity, that the District Court opinion and other disclosure-related opinions employ the old citations.

13

party, political committee, or candidate"; "a communication which constitutes an expenditure or an independent expenditure under this Act"; and "a communication which constitutes a candidate debate or forum." *Id.* § 30104(f)(3)(B)(i–iii).

The Act is broader, defining "communications media" as "television, radio, newspaper or other periodical, sign, Internet, mail or telephone." 15 Del. C. § 8002(7). Excluded from the Act's definition of "electioneering communication" are the following: "membership communication"; "communication appearing in a news article, editorial, opinion, or commentary, provided that such communication is not distributed via any communications media owned or controlled by any candidate, political committee or the person purchasing such communication"; and "communication made in any candidate debate or forum." *Id.* § 8002(10)(b)(2–4).

Though the Act reaches non-broadcast media (by including direct mail and the internet), it is not unique in this regard. Many other state statutes also include non-broadcast media.[7] Furthermore, the media covered by the Act reflects the media actually used by candidates for office in Delaware, and thus it bears a substantial relation to Delaware's interest

---

[7] Nine other state statutes include direct mail. *See* Col. Const. art. XXVIII, § 2(7)(a); AS § 15.13.400(3); Conn. Gen. Stat. § 9-601b(a)(2)(B); Idaho Code Ann. § 67-6602(f)(1); Mass. Gen. Laws ch. 55, § 1; N.C. Gen. Stat. § 163-278.6(8j); 17 V.S.A. § 2901(11); RCW § 42.17A.005(19)(a); W. Va. Code § 3-8-1a(12)(A). Three state statutes include internet communications. *See* AS § 15.13.400(3); Conn. Gen. Stat. § 9-601b(a)(2)(B); 17 V.S.A. § 2901(11).

14

in an informed electorate. Delaware does not have its own major-network television station and campaign television advertisements on nearby Pennsylvania and Maryland stations are both expensive and "generally a poor investment, given that they reach primarily non-Delaware voters." J.A. 134. Statewide campaigns use radio advertising, but this "is typically too expensive for most legislative or local races." J.A. 135.

Had the legislature limited "electioneering communication" to media not actually utilized in Delaware elections, the disclosure requirements would fail to serve the State's interest in a well-informed electorate thereby resulting in a weaker fit between the two. Accordingly, we find that the media covered by the Act is sufficiently tailored to Delaware's interest.

## C.    Earmarking

Throughout its brief, DSF represents that BCRA limits disclosure to those donors who earmarked their donations to fund electioneering communications (Appellee Brief at 5, 20, 33, 36) and implies that, to survive constitutional scrutiny, the Act must be similarly limited. However, BCRA itself does not contain an earmarking requirement. Rather, after the Court decided *McConnell*, the Federal Elections Commission ("FEC") passed 11 C.F.R. § 104.20(c)(9), which contained an earmarking limitation. [8] The FEC regulation was in effect

---

[8]    "Statements of electioneering communications filed under paragraph (b) of this section shall disclose the following information . . . . If the disbursements were made by a corporation or labor organization pursuant to 11 CFR § 114.15, the name and address of each person who made a

15

when *Citizens United* was decided, but it was thereafter vacated as "an unreasonable interpretation of [] BCRA." *Van Hollen v. FEC*, No. 11-0766, 2014 WL 6657240, at *1 (D.D.C. Nov. 25, 2014).[9]

Nothing in *Citizens United* implies that the Court relied upon the FEC earmarking regulation when approving of BCRA's disclosure regime. The opinion does not mention

---

donation aggregating $1,000 or more to the corporation or labor organization, aggregating since the first day of the preceding calendar year, which was made *for the purpose of furthering electioneering communications*." 11 C.F.R. § 104.20(c)(9) (2014) (emphasis added).

[9] In 2012, the D.C. District Court first invalidated the FEC regulation for impermissibly altering the meaning of BCRA. *Van Hollen v. FEC*, 851 F. Supp. 2d 69 (D.D.C. 2012). The FEC did not appeal this ruling, but the Center for Individual Freedom intervened. The D.C. Circuit reversed, holding that the District Court erred in disposing of the case under *Chevron* step one, but remanded with instructions for the District Court to refer the matter to the FEC to explain the meaning and scope of the regulation or to engage in further rulemaking to clarify. *Ctr. for Individual Freedom v. Van Hollen*, 694 F.3d 108, 111 (D.C. Cir. 2012). The FEC decided not to undertake further rulemaking. *Van Hollen*, 2014 WL 6657240, at *4. In its 2014 decision, the D.C. District Court once again invalidated the FEC regulation, this time holding under *Chevron* step two that the regulation was arbitrary and capricious. *Id.* at *1. The Center for Individual Freedom filed its notice of appeal in January 2015; resolution of this matter is still pending.

earmarking and 11 C.F.R. § 104.20(c)(9) is not cited. As such, DSF's representation that the Act must limit disclosure to those donors who earmarked their donations to fund electioneering communications is unavailing.

Our analysis does not change simply because an earmarking limitation would result in a more narrowly tailored statute. As discussed above, a disclosure requirement is subject to "exacting scrutiny," which necessitates a "substantial relationship" between the State's interest and the disclosure required. The Act marries one-time, event-driven disclosures to the applicable "election period," which is itself controlled by the relevant candidate's term. This provides the necessary "substantial relationship" between the disclosure required and Delaware's informational interest.[10]

---

[10] Disclosure that is singular and event-driven is "far less burdensome than the comprehensive registration and reporting system [oftentimes] imposed on political committees." *Barland*, 751 F.3d at 824 (discussing *Citizens United* and BCRA). *But see Worley*, 717 F.3d at 1250 (rejecting facial challenge to ongoing [political action committee] reporting regime by four individuals who wanted to spend $600 because such regime was not overly burdensome and "require[s] little more if anything than a prudent person or group would do in these circumstances anyway"). A comparison of the Act's political action committee ("PAC") disclosure requirements to the disclosure required of DSF shows that the former is much more extensive. Under § 8030, a PAC is required to file ongoing reports that disclose, inter alia: assets on hand; the name and address of each person making contributions in excess of $100; the name and address of each political committee from

17

## IV.    CONCLUSION

As demonstrated above, the Act is constitutional as applied to DSF's Voter Guide, therefore DSF has not established likelihood of success on the merits. We need not analyze the other factors implicating a preliminary injunction analysis. Accordingly, the District Court abused its discretion in granting the preliminary injunction in favor of DSF. For the foregoing reasons we will reverse the judgment of the District Court granting DSF's motion for preliminary injunction and remand for entry of judgment in favor of Appellants.

---

or to which it made any transfer of funds; the amount of each debt in excess of $50; proceeds from ticket sales, collections, and sales of items; total expenditures; and all goods and services contributed in kind. 15 Del. C. § 8030(d)(1–2), (4–5), (6a–c), (10–11). Whereas DSF — and other organizations making "electioneering communications" — are required to make much more limited disclosures, and then only when a triggering communication is made. *Id.* § 8005. Whether the Act's disclosure requirements for PACs would be overly burdensome as applied to DSF is not an issue that is before us and thus is not one we reach today.