HARDIMAN, Circuit Judge,
dissenting with whom CHAGARES, JORDAN, GREENAWAY, JR., and GREENBERG, join.
Today the Court holds that twelve-yearolds have a constitutional right to wear in *325 school a bracelet that says “I ¥ boobies! (KEEP A BREAST).” Because this decision is inconsistent with the Supreme Court’s First Amendment jurisprudence, I respectfully dissent.
I
My colleagues conclude that the Supreme Court’s decision in Bethel School District No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), cannot justify the Easton Area School District’s bracelet ban “because [the bracelets] comment on a social issue.” Maj. Typescript at 298. This limitation on the ability of schools to regulate student speech that could reasonably be deemed lewd, vulgar, plainly offensive, or constituting sexual innuendo finds no support in Fraser or its progeny. The Majority’s “high value speech” modification of Fraser is based on the following two premises it derives from the Supreme Court’s decision in Morse v. Frederick, 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007): first, that Justice Alito’s concurrence in Morse is the “controlling” opinion in that case, Maj. Typescript at 304 n.10, 312, 313, 314; and second, that Morse “modified” the Supreme Court’s decision in Fraser, Maj. Typescript at 298, 313-15. Both premises are wrong.
A
I begin with the Majority’s first premise, namely, that Justice Alito’s concurrence in Morse is the “controlling” opinion in that case, despite the fact that Chief Justice Roberts’s majority opinion was joined in full by four other Justices. Maj. Typescript at 309-14. This distinctly minority view is contrary both to the understanding of Morse expressed by eight of our sister Courts of Appeals and to what we ourselves have repeatedly articulated to be the Court’s holding in Morse. By endorsing the Fifth Circuit’s mistaken understanding of Morse, the Majority applies an incorrect legal standard that leads to the unfortunate result the Court reaches today.
The notion that Justice Alito’s concurrence in Morse is the controlling opinion flows from a misunderstanding of the Supreme Court’s “narrowest grounds” doctrine as established in Marks v. United States, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). In Marks, the petitioners had been convicted of distributing obscene materials pursuant to jury instructions that were modeled on the definition of obscenity articulated in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Marks, 430 U.S. at 190, 97 S.Ct. 990. Because the petitioners’ conduct occurred before the Court had decided Miller, they argued that due process entitled them “to jury instructions not under Miller, but under the more favorable [obscenity] formulation of Memoirs v. Massachusetts.” Id. That formulation was unclear, however, because the Memoirs Court had issued a fractured decision; no more than three of the six Justices who voted for the judgment endorsed any one of three separate opinions, each of which articulated a different standard for obscenity. See Memoirs v. Massachusetts, 383 U.S. 413, 414, 418, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) (plurality opinion) (Justice Brennan, joined by Chief Justice Warren and Justice Fortas, stating that obscenity may be proscribed if it is “utterly without redeeming social value”); id. at 421, 424, 86 S.Ct. 975 (Black and Douglas, JJ., concurring in judgment) (concurring separately on the grounds that obscenity cannot be proscribed); id. at 421, 86 S.Ct. 975 (Stewart, J., concurring in judgment) (concurring on the grounds that only hard-core pornography is proscribable as obscene). The lack of a majority opinion in Memoirs *326 led the Sixth Circuit in Marks to reject the petitioners’ argument that the plurality’s “utterly without redeeming social value” standard was the governing rule. It reasoned that because “the Memoirs standards never commanded the assent of more than three Justices at any one time ... Memoirs never became the law.” Marks, 430 U.S. at 192, 97 S.Ct. 990 (describing the lower court’s holding).
On appeal, the Supreme Court rejected the Sixth Circuit’s reasoning and articulated the following standard: “When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, ‘the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds....’” Id. at 193, 97 S.Ct. 990 (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion)). Based on this reasoning, the Court concluded that because three Justices joined the plurality opinion and Justices Black and Douglas “concurred on broader grounds,” “[t]he view of the Memoirs plurality ... constituted the holding of the Court and provided the governing standards.” Marks, 430 U.S. at 193-94, 97 S.Ct. 990.
As Marks demonstrates, the narrowest grounds rule is a necessary tool for deciphering the holding of the Court when there is no majority opinion. See, e.g., Grutter v. Bollinger, 539 U.S. 306, 325, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (attempting to apply the Marks rule to derive a holding in the “fractured decision” Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). Contrary to the Majority’s holding today, neither Marks nor other Supreme Court decisions support the “unprecedented argument that a statement of legal opinion joined by five Justices of th[e] Court does not carry the force of law,” Vasques v. Hillery, 474 U.S. 254, 261 n. 4, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). Rather, the narrowest grounds rule applies only to “discern a single holding of the Court in cases in which no opinion on the issue in question has garnered the support of a majority.” Id.; cf. Black’s Law Dictionary 1201 (9th ed.2009) (defining a “majority opinion” as “[a]n opinion joined in by more than half the judges considering a given case”).
Unable to find persuasive Supreme Court authority to buttress its novel reading of Marks, the Majority argues that our Court has “applied the narrowest-grounds approach in circumstances beyond those posed by Marks, including to determine holdings in majority opinions.” Maj. Typescript at 310 (footnotes, citation, and internal quotation marks omitted). For support, the Majority cites our decisions in Horn v. Thoratec Corp., 376 F.3d 163 (3d Cir.2004), and United States v. Bishop, 66 F.3d 569 (3d Cir.1995). Maj. Typescript at 310-12. Neither case counsels the Majority’s application of the narrowest-grounds doctrine to interpret Morse.
In Horn, we looked to Justice Breyer’s concurrence in Medtronic v. Lohr, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), for guidance on how to address an issue central to our case, but that the Lohr Court discussed only in dicta. See Horn, 376 F.3d at 175-76 (comparing Justice Breyer’s “more narrow” view on preemption with “Justice Stevens’ sweeping pronouncement [in his plurality opinion] that [the statute at issue] almost never preempts a state common law claim”). Likewise, in Bishop, we cited Justice Kennedy’s concurrence in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in order to reinforce the already established principle that *327 courts must exercise ‘ “great restraint’ before a court finds Congress to have overstepped its commerce power” despite Lopez’ s revolutionary holding. Bishop, 66 F.3d at 590 (quoting Lopez, 514 U.S. at 568, 115 S.Ct. 1624 (Kennedy, J., concurring)). Critically, in neither of these cases did we indicate a belief that a concurring Justice can create a new rule of law simply by both asking and answering a question left unaddressed by the majority opinion. In fact, we noted that Justice Breyer’s concurrence in Horn was particularly persuasive because “Justice Breyer did not discuss issues in his concurring opinion that Justice Stevens, writing on behalf of the four-judge plurality, did not reach.” Horn, 376 F.3d at 175. That is not the case here.
The Majority concedes that a concurring “justice’s opinion ‘cannot add to what the majority opinion holds’ by ‘binding the other four justices to what they have not said.’” Maj. Typescript at 310 (quoting McKoy v. North Carolina, 494 U.S. 433, 462 n. 3, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (Scalia, J., dissenting)). Yet by holding that Justice Alito’s concurrence “controls the majority opinion in Morse,’’ Maj. Typescript at 309, the Majority violates this very principle. The majority in Morse noted that “this is plainly not a case about political debate,” Morse, 551 U.S. at 403, 127 S.Ct. 2618, and refused to address what the result of the case would have been had Frederick’s banner been “political.” The Majority implies that Justice Alito’s concurrence provides a definitive, “controlling” answer to fill the void left by the Morse majority opinion, but the Supreme Court has disavowed this approach: “The Court would be in an odd predicament if a concurring minority of the Justices could force the majority to address a point they found it unnecessary (and did not wish) to address, under compulsion of [the dissent’s] new principle that silence implies agreement.” Alexander v. Sandoval, 532 U.S. 275, 285 n. 5, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Put another way, a majority “holding is not made coextensive with the concurrence because [the majority] opinion does not expressly preclude (is ‘consistent with[ ]’ ... ) the concurrence’s approach.” Id.
Notwithstanding the Majority’s statement to the contrary, we have never applied the Marks rule to hold that a concurrence may co-opt an opinion joined by at least five Justices. Rather, consistent with Marks, “we have looked to the votes of dissenting Justices if they, combined with votes from plurality or concurring opinions, establish a majority view on the relevant issue.” United States v. Donovan, 661 F.3d 174, 182 (3d Cir.2011) (emphasis added); see also Student Pub. Interest Research Grp. of N.J., Inc. v. AT & T Bell Labs., 842 F.2d 1436, 1451 & n. 16 (3d Cir.1988). In Donovan, we used Marks to analyze the Supreme Court’s “fractured” decision in Rapanos v. United States, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), a case in which only three other Justices joined Justice Scalia’s plurality opinion and four others dissented. Donovan, 661 F.3d at 179, 182. Nowhere did we suggest that Marks would have been applicable had Rapanos featured a single majority opinion. Likewise, in Planned Parenthood of Southeastern Pennsylvania v. Casey, 947 F.2d 682 (3d Cir.1991), rev’d on other grounds, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), we held that Marks stands for the proposition that “the controlling opinion in a splintered decision is that of the Justice or Justices who concur on the ‘narrowest grounds.’ ” Casey, 947 F.2d at 693 (emphasis added). We then applied this principle while interpreting the Supreme Court’s plurality decisions in Webster v. Reproductive Health Services, 492 U.S. 490, 109 S.Ct. 3040, 106 *328 L.Ed.2d 410 (1989), and Hodgson v. Minnesota, 497 U.S. 417, 110. S.Ct. 2926, 111 L.Ed.2d 344 (1990). See Casey, 947 F.2d at 695-96 (noting that in Webster “[t]he five Justices in the majority issued three opinions,” none of which garnered five votes on the legal issue in dispute, and that “Hodgson was decided in a similar manner”). Once again, we gave no indication that Marks would have applied had five Justices or more joined the same opinion.
I also find it significant that, in the six years since Morse was decided, nine of ten appellate courts have cited as its holding the following standard articulated by Chief Justice Roberts in his opinion for the Court: “[A] principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use,” Morse, 551 U.S. at 403, 127 S.Ct. 2618.[1] Not one of these courts indicated that Justice Alito’s concurrence controls, or that his dicta regarding “political or social speech” altered or circumscribed the Court’s holding in Morse. We too have articulated the import of Morse consistent with these eight appellate courts: “[I]n Morse, the Court held that ‘schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use.’ ” K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist., 710 F.3d 99, 107 (3d Cir.2013) (citation omitted).[2] This *329 widespread consensus is further proof that Chief Justice Roberts’s majority opinion, not Justice Alito’s concurrence, is the controlling opinion in Morse.
Before today, only the Fifth Circuit had held otherwise. See Morgan v. Plano Indep. Sch. Dist., 589 F.3d 740, 746 n. 25 (5th Cir.2009) (“We have held Justice Alito’s concurrence to be the controlling opinion in Morse.” (citing Ponce v. Socorro Indep. Sch. Dist., 508 F.3d 765, 768 (5th Cir. 2007))); see also Morgan, 589 F.3d at 745 n. 15 (interpreting the holding in Morse to be “that schools may regulate speech that a reasonable observer would interpret as advocating illegal drug use and that could not be interpreted as commenting on any political or social issue” (internal quotation marks omitted)).[3] However, the Fifth Circuit did not cite Marks or any other “narrowest grounds” case and provided no justification to support its conclusion that Justice Alito’s concurrence is the controlling opinion in Morse. As the Seventh Circuit has aptly noted:
The plaintiff calls Justice Alito’s concurrence the “controlling” opinion in Morse because Justices Alito and Kennedy were part of a five-Justice majority, so that their votes were crucial to the decision. But they joined the majority opinion, not just the decision, and by doing so they made it a majority opinion and not merely, as the plaintiff believes (as does the Fifth Circuit, Ponce v. Socorro Independent School District, 508 F.3d 765, 768 (5th Cir.2007)), a plurality opinion. The concurring Justices wanted to emphasize that in allowing a school to forbid student speech that encourages the use of illegal drugs the Court was not giving schools carte blanche to regulate student speech. And they were expressing their own view of the permissible scope of such regulation.
Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204, 523 F.3d 668, 673 (7th Cir.2008) (emphasis added) (citation omitted). This interpretation of the relationship between Justice Alito’s concurrence and the majority opinion in Morse is the correct one because it is faithful to Marks and its progeny.
For the reasons stated, I would not read Justice Alito’s concurrence as altering or circumscribing a majority opinion for the Court that he joined in toto. Thus, the Court’s holding in Morse remains the familiar articulation that has been consistently stated, time and again, by this Court and eight other Courts of Appeals: “[A] principal may, consistent with the First Amendment, restrict student speech at a *330 school event, when that speech is reasonably viewed as promoting illegal drug use.” Morse, 551 U.S. at 403, 127 S.Ct. 2618.
B
If Justice Alito’s concurrence is not the “controlling” opinion in Morse, the Majority has committed legal error by engrafting his dicta regarding “social or political” commentary as a limitation upon the ability of schools to regulate speech that runs afoul of Fraser. But even assuming, arguendo, that Justice Alito’s concurrence alters or circumscribes the Court’s opinion in Morse, it is far from clear that it had anything to say about the realm Fraser carved out of Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).
Tinker established the general rule that “student expression may not be suppressed unless school officials reasonably conclude that it will ‘materially and substantially disrupt the work and discipline of the school.’ ” Morse, 551 U.S. at 403, 127 S.Ct. 2618 (quoting Tinker, 393 U.S. at 513, 89 S.Ct. 733); see also, e.g., Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 211 (3d Cir.2001). Tinker's, “substantial disruption” test does not apply in every case, however. As then-Judge Alito wrote when he was a member of this Court, “the Supreme Court has carved out a number of narrow categories of speech that a school may restrict even without the threat of substantial disruption.” Id. at 212; see also J.S., 650 F.3d at 927 (emphasizing that the exceptions to Tinker are “narrow”). First came Fraser, in which the Supreme Court held that schools may restrict the manner in which a student conveys his message by forbidding and punishing the use of lewd, vulgar, indecent, or plainly offensive speech. See Fraser, 478 U.S. at 680-86, 106 S.Ct. 3159. Then, in Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court held that administrators may regulate speech that is school-sponsored or could reasonably be viewed as the school’s own speech. Id. at 272-73, 108 S.Ct. 562. Most recently, in Morse the Court held that “schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use.” Morse, 551 U.S. at 397, 127 S.Ct. 2618.
As these cases indicate, “[sjince Tinker, every Supreme Court decision looking at student speech has expanded the kinds of speech schools can regulate.” Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist., 579 F.3d 502, 507 (5th Cir.2009); cf. Morse, 551 U.S. at 417, 127 S.Ct. 2618 (Thomas, J., concurring) (observing that “the Court has since scaled back Tinkers, standard, or rather set the standard aside on an ad hoc basis”). In derogation of this consistent trend, the Majority makes us the first United States Court of Appeals to suggest that Morse has circumscribed Fraser, thereby limiting the ability of teachers and administrators to regulate student speech.
In addition to overriding the careful steps taken to allow schools to regulate student speech since Tinker, the Majority errs by placing Morse at the center of a case that has nothing whatsoever to do with illegal drug use. That Morse is not central to this case is borne out by the way the case was litigated and adjudicated. The District Court concluded that only the standards of Tinker and Fraser are implicated, and neither party ever argued otherwise. See B.H v. Easton Area Sch. Dist., 827 F.Supp.2d 392, 394 (E.D.Pa.2011) (“The two Supreme Court cases examining student speech that are most relevant to this case are Fraser and Tinker.”)i The School District primarily contends *331 that the “I V boobies!” bracelets are prescribable because they express sexual innuendo that can reasonably be classified in the middle school context as lewd, vulgar, and indecent speech. Plaintiffs rejoin that the word “boobies” is neither inherently sexual nor vulgar, especially when conspicuously tied to breast cancer awareness. Until the case reached the en banc Court, no party or judge had suggested that Morse provided the governing standard for this dispute. And rightly so, because this is a Fraser case, not a Morse case, and there are critical differences between the two.
Courts have recognized, time and again, that the three exceptions to Tinker’s general rule are independent “carve-outs.” See, e.g., Saxe, 240 F.3d at 212-14. The Supreme Court has given no indication— either in Morse or any of its subsequent decisions—that it has modified the standard, first articulated in Fraser more than 25 years ago, that governs how schools are to regulate speech they may reasonably deem lewd, vulgar, indecent, or plainly offensive. Moreover, although the appellate courts have had dozens of opportunities to do so, no court has suggested that Morse qualified Fraser in any way. Since Morse, we have had occasion to consider Fraser and have consistently “interpreted [it] to permit school officials to regulate ‘lewd, vulgar, indecent, and plainly offensive speech in school.’” J.S., 650 F.3d at 927 (quoting Saxe, 240 F.3d at 213) (emphasis and internal quotation marks omitted); see also K.A., 710 F.3d at 107 (“In [Fraser ], the Court held that schools may restrict the manner in which a student conveys his message by forbidding and punishing the use of lewd, vulgar, indecent, and plainly offensive speech.” (citation omitted)); Layshock ex rel. Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 212-13 (3d Cir.2011) (same).
In fact, the appellate opinions addressing Morse, Fraser, and Kuhlmeier treat them as independent analytical constructs that permit schools to regulate certain types of speech that would otherwise be protected under Tinker. See, e.g., Hardwick, 711 F.3d at 435 n. 11 (“[W]e must continue to adhere to the Tinker test in cases that do not fall within any exceptions that the Supreme Court has created until the Court directs otherwise.”); Doninger, 642 F.3d at 353-54 (“[B]ecause the t-shirts were not vulgar, could not reasonably be perceived to bear the School’s imprimatur, and did not encourage drug use, they could be subject to regulation different from that permissible for adults in non-school settings only if they threatened substantial disruption to the work and discipline of the School.” (citations omitted)). It is especially notable that even the Fifth Circuit, which mistakenly held that Justice Alito’s concurrence in Morse is “controlling,” continues to treat the Tinker carve-outs as independent exceptions rather than overlapping categories of proscribable speech. See Morgan, 589 F.3d at 745 n. 15 (5th Cir.2009) (characterizing Fraser as “holding schools may prohibit lewd, vulgar, obscene or plainly offensive student speech” and, in the same string citation, separately characterizing Morse as “holding that schools may regulate speech ‘that a reasonable observer would interpret as advocating illegal drug use’ and that could not be ‘interpreted as commenting on any political or social issue’ ” (citations omitted)). The Majority’s own analysis demonstrates that threshold questions in a school speech case are whether the speech at issue is governed by one of the three Tinker carve-outs and, if not, whether the school acted properly under Tinker. See Maj. Typescript at 320-21.
In addition, we have emphasized that the carve-outs touch on “several narrow categories of speech that a school may *332 restrict even without the threat of substantial disruption.” K.A., 710 F.3d at 107 (emphasis added) (internal quotation marks omitted). This does not mean, as the Majority suggests, that the carve-outs narrow one another. See Maj. Typescript at 313 n.17 (citing J.S., 650 F.3d at 927). Rather, it is simply a recognition that they are narrow within their separate spheres. Indeed, courts have been especially careful to underscore the narrowness of the Court’s holding in Morse. See, e.g., Defoe, 625 F.3d at 332-33 (“[T]he Morse holding was a narrow one, determining no more than that a public school may prohibit student expression'at school or at school-sponsored events during school hours that can be ‘reasonably viewed as promoting drug use.’ ” (emphasis added) (citation omitted)); Barr, 538 F.3d at 564 (same); B.W.A. v. Farmington R-7 Sch. Dist., 554 F.3d 734, 741 (8th Cir.2009) (same).
In J.S., we too recognized the “narrowness of the Court’s holding” in Morse. J.S., 650 F.3d at 927.[4] There, we declared that Morse did not apply to a school’s punishment of a student for creating a MySpace profile using graphic language and imagery to disparage her teacher, see J.S., 650 F.3d at 932 n. 10 (“Indisputably, neither Kuhlmeier nor Morse governs this case.”). Instead, we indicated that “the only way for the punishment to pass constitutional muster is if ... J.S.’s speech can be prohibited under the Fraser exception to Tinker.” Id. at 931-32. If the proper standard under Fraser is the Majority’s formulation of whether a student’s lewd speech may “plausibly be interpreted as commenting on a social or political issue,” surely we would have considered whether J.S.’s online profile touched on any such issue. Instead of doing so, we applied the Fraser test while disavowing the relevance of Morse.
The fact that courts have maintained analytical separation among the different Tinker carve-outs makes sense because the Supreme Court created each one for a unique purpose. In K.A. we addressed these “vital interests that enable school officials to exercise control over student speech even in the absence of a substantial disruption.” K.A., 710 F.3d at 107. The vital interest at issue in Morse that “allowls] schools to restrict student expression that they reasonably regard as promoting illegal drug use” is “the special characteristics of the school environment, and the governmental interest in stopping student drug abuse.” Id. (quoting Morse, 551 U.S. at 408, 127 S.Ct. 2618). Fraser allowed schools to punish “lewd, indecent, or offensive speech,” 478 U.S. at 683, 106 S.Ct. 3159, to further “society’s ... interest in teaching students the boundaries of socially appropriate behavior,” K.A., 710 F.3d at 107 (quoting Fraser, 478 U.S. at 681, 106 S.Ct. 3159). And in Kuhlmeier, the interest that “entitle[s] [educators] to exercise greater control over [school-sponsored publications]” is “to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.” K.A., 710 F.3d at 107 (quoting Kuhlmeier, 484 U.S. at 271, 108 *333 S.Ct. 562). The Court’s willingness to curtail the First Amendment rights of students to enable schools to achieve these important goals vindicates the principle that “the rights of students ‘must be applied in light of the special characteristics of the school environment.’” Morse, 551 U.S. at 397, 127 S.Ct. 2618 (quoting Kuhlmeier, 484 U.S. at 266, 108 S.Ct. 562). Because each case was intended to address a separate concern, I disagree with the Majority that language qualifying one type of carve-out applies equally to the others.
In sum, Morse’s “narrow” holding does not apply unless a school has regulated student speech that it viewed as advocating illegal drug use. Notwithstanding its critical reliance on Morse, at one point the Majority seems to agree that Morse does not apply to this case when it states that “no one could reasonably interpret the bracelets as advocating illegal drug use.” Maj. Typescript at 321. The Majority can’t have it both ways. The decision to engraft Justice Alito’s Morse concurrence onto Fraser erodes the analytical distinction between the two lines of cases and turns this appeal into some sort of Fraser/Morse hybrid. “The law governing restrictions on student speech can be difficult and confusing, even for lawyers, law professors, and judges. The relevant Supreme Court cases can be hard to reconcile, and courts often struggle to determine which standard applies in any particular case.” Doninger, 642 F.3d at 353. By using Morse to modify the distinct carve-out established in Fraser, the Majority has muddied the waters and further encumbered the ability of educators to run their schools.
The Majority attempts to make more palatable its decision to engraft Morse’s supposed prohibition of “any restriction of speech that can plausibly be interpreted as commenting on any political or social issue” onto Fraser. For instance, it claims that “the [Supreme] Court did not believe that Fraser’s speech could plausibly be interpreted as political or social commentary.” Maj. Typescript at 306. By claiming that such an interpretation of Matthew Fraser’s “speech nominating a fellow student for student elective office,” Fraser, 478 U.S. at 677, 106 S.Ct. 3159, is wholly “implausible,” the Majority demonstrates the difficulties that arise when it blends together the disparate Tinker carve-outs.
As the Majority rightly notes, the Fraser Court opined that there was a “marked distinction between the political ‘message’ of the armbands in Tinker and the sexual content of Fraser’s speech.” Maj. Typescript at 307 (quoting Fraser, 478 U.S. at 680, 106 S.Ct. 3159). That does not mean, however, that it was implausible to conclude that Fraser’s speech was political. If it were truly implausible to “interpret[ ] [Fraser’s speech] as commenting on any political or social issue,” one must wonder why the United States Court of Appeals for the Ninth Circuit characterized Fraser’s speech as “student political speech-making” and a “campaign speech! ].” Fraser v. Bethel Sch. Dist. No. 403, 755 F.2d 1356, 1363 (9th Cir.1985), rev’d, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); id. at 1368 (Wright, J., dissenting). The three appellate judges who heard Fraser’s case were deemed by the Supreme Court to have erred when they likened his speech to Tinker1 s armband, but that does not mean that it was “implausible” for those three judges to view Fraser’s speech as political. It was, after all, a campaign speech.
A brief hypothetical further demonstrates the problems posed by the Majority’s plausibility-based articulation of the Fraser carve-out. Suppose a student makes a speech at a school assembly. Like Matthew Fraser’s speech, the content is about supporting a candidate for office, *334 but the sexual references are muted enough such that the Majority would deem them “ambiguously lewd” instead of “plainly lewd.” If the student’s speech is about a classmate running for school office, the Majority would say that the school may punish the speaker. But if an identical speech is given and the classmate’s name is replaced with the name of a candidate for president, mayor, or even school board, the Majority would conclude that the First Amendment insulates the student’s speech. In my view, the two speeches are indistinguishable under Fraser.
In sum, the Majority’s approach vindicates any speech cloaked in a political or social message even if a reasonable observer could deem it lewd, vulgar, indecent, or plainly offensive. In both cases, the inappropriate language is identical, but the speech is constitutionally protected as long as it meets the Majority’s cramped definition of “politics” or its as-yet-undefined notion of what constitutes “social commentary.” Fraser repudiated this very idea. “The First Amendment guarantees wide freedom in matters of adult public discourse .... It does not follow, however, that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school.” Fraser, 478 U.S. at 682, 106 S.Ct. 3159 (emphasis added).
II
As noted, the Majority holds that “Fraser ... permits a school to categorically restrict ambiguous speech that a reasonable observer could interpret as having a lewd, vulgar, or profane meaning,” but only “so long as it could not also plausibly be interpreted as commenting on a social or political issue.” Maj. Typescript at 320. It is important to emphasize here that, despite my disagreement with the second part of the Majority’s formulation, I agree fully with its understanding of the objective-reasonableness inquiry compelled under Fraser. See Maj. Typescript 308-09 (discussing why “courts should defer to a school’s decisions to restrict what a reasonable observer would interpret as lewd, vulgar, profane, or offensive”).[5]
The Majority did not find that the school’s interpretation of the bracelets’ message as lewd was objectively unreason *335 able. See Maj. Typescript at 320 n.22 (“[W]e need not determine whether a reasonable observer could interpret the bracelets’ slogan as lewd.”). Thus, had the Majority not engrafted Justice Alito’s concurrence in Morse onto the Fraser standard, my colleagues might agree that the school did not violate the First Amendment when it proscribed the bracelet. Because the Majority chose not to analyze whether the school was reasonable in determining that the bracelet could be proscribed under Fraser, however, I will briefly discuss why that is so.
In this close case, the “I V boobies! (KEEP A BREAST)” bracelets would seem to fall into a gray area between speech that is plainly lewd and merely indecorous. Because I think it objectively reasonable to interpret the bracelets, in the middle school context, as inappropriate sexual innuendo and double entendre, I would reverse the judgment of the District Court and vacate the preliminary injunction.
The District Court correctly ascertained the standard of review to apply in a case that arises under Fraser, but proceeded to misapply that standard. First, by emphasizing whether Plaintiffs intended a vulgar or sexual meaning in their “I V boobies!” bracelets and determining that a nonsexual, breast-cancer-awareness interpretation of the bracelets was reasonable, the Court inverted the proper question. Instead of asking whether it was reasonable to view the bracelets as an innocuous expression of breast cancer awareness, the District Court should have asked whether the school officials’ interpretation of the bracelets—ie., as expressing sexual attraction to breasts—was reasonable. So long as the School District’s interpretation was objectively reasonable, the ban did not contravene the First Amendment or our school-speech jurisprudence.
Second, in its substantive conclusion that “I V boobies!” cannot reasonably be regarded as lewd or vulgar, the District Court highlighted the bracelets’ social value while disregarding their likely meaning to immature middle-schoolers.[6] As the *336 School District argues, the fact that Plaintiffs’ laudable awareness message could be discerned from the bracelets does not render the School District’s ban unconstitutional. “I V boobies!” not only expresses support for those afflicted with breast cancer, but also conveys a sexual attraction to the female breast.
It is true that certain facts indicate that a sexual interpretation of the “I ¥ boobies!” bracelets may be at the outer edge of how a reasonable observer would interpret speech. Most obviously, the bracelets always modify the “I ¥ boobies!” phrase with “(KEEP A BREAST)” or other breast-cancer-awareness messages. “When one reads the entire phrase, it is clearly a message designed to promote breast cancer awareness.” K.J. v. Sauk Prairie Sch. Dist., No. 11-cv-622, slip op. at 14 (W.D. Wis. Feb. 6, 2012). Additionally, school administrators did not immediately recognize the bracelets as vulgar or lewd; students had been wearing the bracelets for two months before they were banned, and teachers had to request guidance on whether and how to deal with the bracelets. Moreover, the school itself was compelled to use the word “boobies” over the public address system and school television station in order to describe the proscribed bracelets, which suggests that the word alone is not patently offensive.
Notwithstanding the facts supporting Plaintiffs’ case, I conclude that “I ¥ boobies!” can reasonably be interpreted as inappropriate sexual double entendre. In the middle school context, the phrase can mean both “I support breast-cancer-awareness measures” and “I am attracted to female breasts.” Many twelve- and thirteen-year-old children are susceptible to juvenile sexualization of messages that would be innocuous to a reasonable adult. Indeed, at least one bracelet-wearer acknowledged that “immature” boys might read a lewd meaning into the bracelets and conceded that she understood why the school might want to ban the bracelets, B.H., 827 F.Supp.2d at 399, and other students parroted the phrase on the bracelets while conveying sexual attraction to breasts. Another school administrator has concluded that the bracelets at issue here “elicit attention by sexualizing the cause of breast cancer awareness.” Sauk Prairie, No. ll-cv-622, at 4. And as Judge Crabb, the only other federal judge to consider these bracelets, put it in Sauk Prairie, “hints of vulgarity and sexuality” in the bracelets “attract attention and provoke conversation, a ploy that is effective for [KABF’s] target audience of immature middle [school] students.” Id. at 15. Finally, as the Gender Equality amicus brief points out, breasts are ubiquitously sexualized in American culture.
The Easton Area Middle School principals’ willingness to say “boobies” to the entire school audience does not imply that the word does not have a sexual meaning; it merely suggests that “boobies” is not plainly lewd. Moreover, although KABF’s decision not to market its products through porn stars and at truck stops is laudable, the interest such organizations have shown in the bracelets is further evidence that the bracelets are read by many to contain a sexual meaning. And the “I ¥ boobies!” bracelets’ breast cancer message is not so obvious or overwhelming as to eliminate the double entendre. For one thing, the bracelets come in many colors other than the shade of pink widely associated with the fight against breast cancer.
Additionally, although Plaintiffs and their amici argue that the casual language of the “I ¥ boobies!” bracelets is intended *337 to make breast cancer issues more accessible and less stigmatized for girls and young women, that purpose does not undermine the plausibility of a sexual interpretation of the bracelets. Nor does the fact that these Plaintiffs’ mothers were happy not only to purchase the bracelets for their teenage daughters but also to wear them render the bracelets immune from school regulation. The mothers’ intent that the bracelets convey a breast-cancer-awareness message, like Plaintiffs’ own subjective motive, is irrelevant to interpreting the meaning of the speech.
Likewise, the School District administrators’ subjective beliefs, expressed at the time of the ban and later during this litigation, do not affect my determination of whether it is objectively reasonable to infer a sexualized meaning from the bracelets. Their failure to use the words “lewd,” “vulgar,” “indecent,” or “plainly offensive” is not fatal to their claim of regulatory authority. Similarly, some principals’ inconsistent testimony regarding what other breast-eancer-related phrases they might censor does not make the phrase at issue here more or less vulgar. Therefore, it is not probative that administrators intermittently indicated that they thought the word “breast” by itself has an impermissible sexual connotation.
Plaintiffs rely on the initial statements by teachers at the middle school that the word “breast” alone in any context and the phrases “breast cancer awareness” and “keep-a-breast.org” could also be banned to argue that the School District has left them no other means to convey their breast-cancer-awareness message. But those words were not banned—indeed, students are permitted to wear KABF’s “check yVurselfl! (KEEP A BREAST)” bracelets-and the administrators changed their position prior to the evidentiary hearing, opining that such phrases would not be inappropriate at school. Also significant is the fact that the Easton Area Middle School has not stifled the message of breast cancer awareness; in the course of a robust breast cancer awareness campaign it merely imposed a permissible restriction on the way in which that message may be expressed. See Saxe, 240 F.3d at 213 (“Fraser speaks to the form and manner of student speech, not its substance. It addresses the mode of expression, not its content or viewpoint.” (citation omitted)).
Nor is Plaintiffs’ position saved by the fact that the “I V boobies!” phrase was “chosen to enhance the effectiveness of the communication to the target audience.” B.H., 827 F.Supp.2d at 406. The District Court’s focus on the strategic purpose of the words and format used in the bracelets was misguided. If indecency were permitted in schools merely because it was intended to advance some laudable goal, Matthew Fraser’s speech would have been constitutionally protected insofar as he intended to win the attention of his classmates while advocating the election of his friend.
Finally, if we were to hold that the breast cancer message here makes any sexual reading of the bracelets unreasonable, schools would be obliged to permit more egregiously sexual advocacy messages. As Ms. DiVietro acknowledged, “other bodily parts in the human anatomy ... can get cancer and ... other types of slang terms” would have to be condoned. App. 275. DiVietro raised the specter of an “I V Balls” slogan to support testicular cancer awareness. Id. at 275-76. These examples are not speculative. The Testicular Cancer Awareness Project sells “feelmyballs” bracelets to encourage male self-examinations and general awareness. See Testicular Cancer Awareness Project, *338 http://www.feelmyballs.org/shop/front.php (last visited June 3, 2013). If middle school students have a constitutional right to wear “I V boobies!” bracelets, it would be difficult to articulate a limiting principle that would disallow these other catchy phrases, so long as they were aimed at some socially beneficial objective.
Simply stated, the District Court correctly articulated the proper standard of review to be applied in cases that implicate Fraser (such as this one), but it strayed from that standard when evaluating the reasonableness of Plaintiffs’ intended meaning. For that reason, and because the School District’s reading of “I V boobies!” as inappropriate sexual double entendre was a reasonable interpretation in the middle school context, I would hold that Plaintiffs cannot demonstrate a likelihood of success on the merits of their claim. Accordingly, the District Court abused its discretion in granting a preliminary injunction.
As this case demonstrates, running a school is more complicated now than ever before. Administrators and teachers are not only obliged to teach core subjects, but also find themselves mired in a variety of socio-political causes during school time. And they do so in an era when they no longer possess plenary control of their charges as they did when they acted in loco parentis. See, e.g., Morse, 551 U.S. at 413-16, 127 S.Ct. 2618 (Thomas, J., concurring). The decisions school administrators must make regarding the deportment of their students—what they say, what they wear, or what they do—require common sense and good judgment. Many of those decisions will involve matters about which reasonable people can disagree. In the close cases, such as this one, there is virtue in deferring to the reasonable judgments of those responsible for educating our nation’s youth. With respect, I dissent.

. See Doninger v. Niehoff, 642 F.3d 334, 345 (2d Cir.2011) ("[T]he Supreme Court has determined that public schools may 'take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use' because of the special nature of the school environment and the dangers posed by student drug use.” (citations omitted)); Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 435 (4th Cir. 2013) (”[S]chool officials can regulate student speech that can plausibly be interpreted as promoting illegal drugs because of 'the dangers of illegal drug use.’ ” (citation omitted)); Defoe ex rel. Defoe v. Spiva, 625 F.3d 324, 332-33 (6th Cir.2010) ("As this Court has already recognized, however, the Morse holding was a narrow one, determining no more than that a public school may prohibit student expression at school or at school-sponsored events during school hours that can be 'reasonably viewed as promoting drug use.’ ” (citation omitted)); Zamecnik v. Indian Prairie Sch. Dist. No. 204, 636 F.3d 874, 877 (7th Cir.2011) (noting that promoting "the use of illegal drugs, [is] a form of advocacy in the school setting that can be prohibited without evidence of disruption” (citation omitted)); D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60, 647 F.3d 754, 761 (8th Cir.2011) ("Chief Justice Roberts reviewed the Court’s approach in these prior decisions before holding ‘that schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use.’ ” (citation omitted)); Red-ding v. Safford Unified Sch. Dist. No. 1, 531 F.3d 1071, 1094 (9th Cir.2008), rev’d on other grounds, 557 U.S. 364, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009) ("[S]chools can 'restrict student expression that they reasonably regard as promoting illegal drug use.’ ” (citation omitted)); Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1228 (10th Cir. 2009) (“[A] public school may prohibit student speech at school or at a school-sponsored event during school hours that the school 'reasonably view[s] as promoting illegal drug use.’ ” (citation omitted)); Boim v. Fulton Cnty. Sch. Dist., 494 F.3d 978, 984 (11th Cir.2007) ("[T]he special characteristics of the school environment and the governmental interest in stopping student drug abuse ... allow schools to restrict student expression that they reasonably regard as promoting illegal drug use.” (citation omitted)).

. The Majority cites our opinion in J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915 (3d Cir.2011), as evidence that we "previously” had the "intuition” that Justice Alito's concurrence controls the Supreme Court's opinion in Morse. Maj. Typescript at 313 n.17. Butin J.S., as in K.A., we explicitly noted that the Supreme Court "held that 'the special characteristics of the school environment and the governmental interest in stopping drug abuse allow schools to restrict student expres *329 sion that they reasonably regard as promoting illegal drug use.’ ” 650 F.3d at 927 (emphasis added) (quoting Morse, 551 U.S. at 408, 127 S.Ct. 2618) (alterations, citation, and internal quotation marks omitted).

. The Majority claims that both the Sixth Circuit and Tenth Circuit agree with the Fifth Circuit that Justice Alito’s concurrence is controlling. See Maj. Typescript at 313 n.17 (citing Barr v. Lafon, 538 F.3d 554, 564 (6th Cir.2008), and Corder, 566 F.3d at 1228). I disagree. In Barr, the Sixth Circuit recognized Chief Justice Roberts’s articulation that "a public school may prohibit student speech at school or at a school-sponsored event during school hours that the school 'reasonably view[s] as promoting illegal drug use’ ” as the Court’s “narrow holding.” 538 F.3d at 564 (citation omitted). Although the opinion went on to discuss Justice Alito's concurrence, the Sixth Circuit never opined that the concurrence controls or otherwise modifies what the court had previously described as Morse's "narrow holding.” See id.; see also Defoe, 625 F.3d at 332-33 & n. 5 (describing the same "narrow” holding in Morse before discussing Justice Alito’s concurrence in a footnote). The same can be said for the Tenth Circuit's decision in Corder, which essentially parrots Barr description of Morse’s majority opinion and Justice Alito's concurrence. See Corder, 566 F.3d at 1228 (quoting Barr, 538 F.3d at 564).

. The Majority believes that this clause serves as an indicator that Justice Alito’s concurrence narrowed the holding in Morse and, in turn, narrowed the speech that schools can proscribe under Fraser. See Maj. Typescript at 313 n.17. Contrary to the Majority's implication, in J.S. we neither addressed Justice Alito's discussion of student speech that touches on matters plausibly related to a social or political issue nor indicated a belief that his concurrence somehow modified the Morse Court’s majority opinion, which we quoted verbatim as the Court's holding. See J.S., 650 F.3d at 927.

. Though I believe an objective-reasonableness test is the correct interpretation of Fraser, its level of generality leaves something to be desired, particularly when one considers that the lower courts will look to our decision for guidance. The Majority states that "[i]t remains the job of judges ... to determine whether a reasonable observer could interpret student speech as lewd, profane, vulgar, or offensive.” Maj. Typescript at 308-09. But who is this "reasonable observer”? The Majority gives us clues: he "would not adopt an acontextual interpretation” and would consider "the plausibility of the school’s interpretation in light of competing meanings; the context, content, and form of the speech; and the age and maturity of the students.” Maj. Typescript at 309. I would add several more considerations. Most importantly, evolving societal norms counsel that what is "objectively” considered "lewd, profane, vulgar, or offensive” one day may not be so the next. See, e.g., Fraser, 478 U.S. at 691, 106 S.Ct. 3159 (Stevens, J., dissenting) (' “Frankly, my dear, I don’t give a damn.' When I was a high school student, the use of those words in a public forum shocked the Nation. Today Clark Gable’s four-letter expletive is less offensive than it was then.”). Furthermore, given the diversity of opinions and perspectives across our country, the type of speech that may reasonably fall into one of the prescribable categories would vary widely from one community to the next. These considerations highlight the importance of ensuring that "the determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.” Fraser, 478 U.S. at 683, 106 S.Ct. 3159. *336 (alterations, citations, and internal quotation marks omitted)).

. In fact, we have questioned the applicability of the Supreme Court's student speech jurisprudence in the elementary and middle school settings:
[A]t a certain point, a school child is so young that it might reasonably be presumed the First Amendment does not protect the kind of speech at issue here. Where that point falls is subject to reasonable debate. In any event, if third graders enjoy rights under Tinker, those rights will necessarily be very limited. Elementary school officials will undoubtedly be able to regulate much—perhaps most—of the speech that is protected in higher grades. When officials have a legitimate educational reason— whether grounded on the need to preserve order, to facilitate learning or social development, or to protect the interests of other students—they may ordinarily regulate public elementary school children’s speech. Walker-Serrano ex rel. Walker v. Leonard, 325 F.3d 412, 417-18 (3d Cir.2003); see also Walt ex rel. Walz v. Egg Harbor Twp. Bd. of Educ., 342 F.3d 271, 276 (3d Cir.2003) (noting that "the age of the students bears an important inverse relationship to the degree and kind of control a school may exercise: as a general matter, the younger the students, the more control a school may exercise”). Other appellate courts share our misgivings, noting that “the younger the children, the more latitude the school authorities have in limiting expression.” Zamecnik, 636 F.3d at 876 (citing Muller ex rel. Muller v. Jefferson Lighthouse Sch., 98 F.3d 1530, 1538-39 (7th Cir.1996)); see also Nuxoll, 523 F.3d at 673 (when a school regulates the speech of children that are "very young ... the school has a pretty free hand”); Morgan, 659 F.3d at 386 ("[I]n public schools, the speech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students. Indeed, common sense dictates that a 7-year-old is not a 13-year-old, and neither is an adult.”